We have four cases on the calendar this morning. Trade case from the CIT. Patent case from the District Court. Veterans appeal. And employee case from the Court of Federal Claims. One of the usual days when we have four different types of cases and only one patent case. The first case is the trade case. And after we hear argument on the trade case, we will briefly adjourn and come back quite soon with the panel modified by one-third. And our first case is Papierfabrik August Koehler, maybe, v. United States in Aplion, 2016, 2425. Mr. Wood. Thank you, Your Honor. May it please the Court. I'm John Wood on behalf of Kohler. In Administrative Review 3, a case that this Court decided in 2016, Commerce imposed total adverse facts available, a 75.36% AFA rate, and $100 million in duties on Kohler. As I'll explain, this case that's before you now is fundamentally different in at least two ways. Nonetheless, despite those significant differences, Commerce treated the two cases the same and imposed the same AFA rate, total AFA, and another $80 million in duties on Kohler. Now, there are two fundamental, critical ways in which this case differs from the AR3 case. The first way in which they differ is that in the case at hand, there were only five omitted home market sales out of a total of 1,100 in the home market database. Now, as Your Honors may know, in calculating margins, Commerce compares individual U.S. sales to a monthly average of home market sales. And so because the earliest such sale occurred in September 28, 2010, the first 10 months of the home market database were in no way affected by the omission of home market sales. Let me ask you one thing. If I could just, if it's okay, please, if I could jump to the second issue relating to the 144% specific margin rate. And I gather at pages 8611 and 8623 of the joint appendix, we have there your offering on the remand to establish that there was a calculation error with respect to that, correct?  And I guess you have the figures purportedly showing this calculation error, and I think at 8643 and 8644, this is the, I guess, what was the attachment 3 to your remand submission? If you could just, I apologize, I confess, how do you show, how does 8643-44 exactly show that there was this improper duplication of the discount? Yes. It was the 1,088.35 was supposedly computed twice, three times instead of just once, right? So, Your Honor, there was a total of 3,000 that should have been spread across the three different line items, and what Kohler did is applied the entire amount to the first line item. And because of that, and this is on the U.S. sales, because the entire discount was applied to one single roll, basically, of paper, it had a ridiculously low price and therefore a huge margin compared to all the other margins. You mean it should have been just 1,088.35 for each of three? Correct. Instead the full 3,000 was applied to the first one. Okay. And, but to the other two, was 1,088 also applied? I believe it was not, and so those other two ended up really having no impact at all. So what you're saying is the problem was it all just got bunched into one. I believe it all got bunched into one, which created a ridiculous margin that's grossly disproportionate from all the other margins. But that all is information that you provided later that Commerce decided not to consider, correct? That's correct, and the reason is because 144.63% transaction the first time around wasn't used in any significant way. It was only after, on remand, that it was being used for purposes of corroboration that it took on a significance, and I do want to emphasize. But it was used in the first Kohler case, correct? In the first time in this, in AR2, are you referring to? It was used in AR3, but here's a very important difference. In AR3, Kohler did not submit any evidence to Commerce showing that that transaction was the result of a mathematical error. So what happened here is on remand, unlike in AR3, Commerce reopened the record, and it specifically asked the parties to submit information about the AFA rate and corroboration of that rate. In response to that request and the reopening of the record, Kohler submitted this information that we were just discussing. And so we believe that it was an abuse of Commerce's discretion to refuse to consider evidence showing that it was a mathematical error. And I want to emphasize that when this was submitted, this information about the mathematical error was not being submitted in order to correct the omission of the home market sales. This had nothing to do with that omission of home market sales or the third country sales in the first place. This is simply a mathematical error that Kohler was trying to bring to Commerce's attention when Commerce reopened the record and specifically invited comments on this topic. Stuart, I'm not sure it's in the – I'm not sure it's in – were you finished answering? Yes, I was. I'm not sure it's in the record before us, but when was this calculation error discovered? I don't know if the record reflects that. I know you sought to bring it to Commerce's attention on the remand, but when did the Kohler folks learn about it? Yeah, you're correct that it was not – that it's not in the record. So I don't know a date on which they learned about that. Okay. Yes, sir. You keep referring to five sales, only five sales being affected. Correct. But I'm not sure there's really evidence of that in the record. I mean, there's clearly a transshipment scheme that Commerce was concerned about, and you say that only five sales were affected, but Commerce's position was they can't tell that. Yeah, it absolutely is on the record, and I do want to emphasize this point. The appellees state in their briefs that there's no evidence on the record regarding the extent of the omissions, but, in fact, there are. I'd point you to the appendix, page 8088, which shows the specific documents from the AR-3 record that were placed on the record in AR-2. That includes two documents that make this point. The first is Kohler's first supplemental questionnaire response from AR-3, which stated on page 2, and this can be found at page 8111, that the earliest such shipment took place on September 28, 2010. The second one can be found at appendix page 8130, and that's the July 19, 2012 letter to Commerce on page 2, footnote 1, states that there were five line items omitted from the home market database. Now, importantly, Commerce and its determination on remand not only cited and relied on these two documents, but, in fact, relied on the very passages that I was just referring to, and the only basis that Commerce had for concluding that Kohler omitted home market sales during period of review 2 at all was the admission by Kohler that that occurred, and as part of that admission, Kohler stated that the first such sale was on October 28, 2010, and so it is, I'm sorry, September 28, 2010, and so it's that very statement saying that the first such omitted home market sale occurred on September 28 that Commerce relies upon in concluding that there were omitted home market sales during period of review 2, but Commerce cherry picks that and only relies on and finds that there were omitted home market sales during period of review 2, but ignores the fact that the first such sale was on September 28, and, importantly, the allegation in AR3 by Avion was merely that there were omitted home market sales in period of review 3, so the only reason that Commerce knew about the fact that there were omitted home market sales in period of review 2, which is the case before you, is because Kohler disclosed that as a result of its independent internal investigation, it found that five such sales occurred at the tail end of period of review 2. But there's no documentary information. These are just self-serving statements from counsel, right? No, not at all, Your Honor. These are just like any other information that Commerce relies on, just like it's any of the questionnaire responses or databases. They were submitted by counsel, but they were certified by an officer of the corporation, in this case a chief financial officer. But wasn't Commerce's position that in the absence of documentation, that it was difficult to trust anything Kohler was submitting, given the transshipment scheme? Well, it wouldn't allow Kohler to submit any documentation. So, yes, it did say in the absence of documentation, but it says in the absence of documentation after they refused to allow Kohler to submit any documentation to that effect. Well, the documentation that you tried to submit after the fact didn't include this documentation, did it? It did. Kohler attempted to submit information showing that there were those five sales and the exact statistics for things like price and quantity for those sales. Commerce refused to allow them to submit that. And so having refused to allow them to submit that, then they point to the fact that there's no record evidence. But, in fact, the only record evidence establishing at all that there were any sales during period of review 2 was those two statements that I pointed you to. So your position is that once Commerce determined that it really couldn't trust anything that they were being told because there was material omitted and that they were going to apply AFA, that on remand you could then choose to submit information to say they shouldn't have done that? No. This is the problem. You didn't supply the stuff up front when Commerce said there's material omissions and we can't trust this data, right? No. There were five omitted sales from the home market database the first time around. Kohler agreed to a remand because Kohler brought to Commerce's attention the fact that there were omitted sales in period of review 2. Now, there was an allegation in period of review 3 that there were omitted home market sales there, and that was because Appian brought that to Kohler's management attention. But Kohler's management had an independent investigation done and found there were five omitted home market sales from period of review 2. And the only basis for Commerce to conclude that there were omitted home market sales from period of review 2 on remand was that admission by Kohler that the first such sale occurred on September 28th. So what Commerce did is they just cherry-picked that, and instead of saying the first sale occurred on September 28th, they just say Kohler admits that there were sales during period of review 2, but we're not going to believe anything that they say, and we're going to throw out all of their data. And that makes no sense because they're basically saying, you know, Kohler's lying, so we can't trust anything they're saying, so we're just going to throw out everything, and we're not going to give any weight to their statement that the first sale occurred on September 28th. But if you think about it, there would be no reason for Kohler, if it were going to try to lie about this and deceive Commerce, there was no reason for Kohler to disclose in the first place that there were sales during period of review 2 that were omitted because there was not even an allegation to that effect. So it makes no sense for Commerce to simply cherry-pick certain parts of the admission and ignore the other parts, and the fact is there's no evidence on the record that in any way calls into question the first 10 months of the home market database, which were separately, each one of those months is a separate calculation. There's nothing about an omission of home market sales beginning on September 28th that in any way affects the first 10 months of the home market database. And so this is why this case is entirely different from Administrative Review 3. What legal authority do you have for the proposition that Commerce must assess materiality of the omitted data before it can apply AFA? Well, it's not really a materiality question, Your Honor. It's more a question of what data is usable. The first 10 months of the home market database, which were timely submitted, and there were no errors in that, that was timely submitted, verifiable. There's no reason why Commerce can't rely on that. So there's a series of cases saying that Commerce can only use AFA to fill gaps in the record. So Zhejing Dunan from this court would be an example of that. That case also favorably cited the CIT's decision in Gerber Foods. That was a case where there was misleading, intentionally misleading false information regarding whether a certain company was an importer of record. And so there were even falsified documents submitted. And what Commerce had to do there was apply AFA only to those sales that went through or allegedly went through that importer. The rest of the sales that were unaffected by the false statements still had to be relied upon by Commerce. And so we're saying the same thing is true here. You want to save some time? I would love to, Your Honor. Thank you very much. Mr. Kurland for the government. You will yield two minutes to Mr. Kurland. Yes. Good morning, Your Honors. May it please the Court. The issues in this case are extremely similar to the issues that this court has already ruled upon in the third review case, in particular addressing the total AFA issue, the issue that plaintiff's counsel was talking about towards the end of his argument. One thing that each of the three courts that has already reviewed these issues and ruled on them, the two trial court decisions and this court's decision in the third review case, all of them have come to the conclusion that the significance of Kohler's fraud, which was an elaborate, extensive fraud that spanned two different review periods, went beyond the numerical value of the sales that Kohler concealed. But, I mean, I think the argument on the other side is that essentially, even if there was a fraud that was extensive in the third review period, that you're punishing them in AR2 for what you found in AR3. Well, that's not correct. I mean, the level, for example, of the false statements by Kohler in this review was even more extensive because, for example, Kohler falsely certified, that's important because we've talked about certification, Kohler falsely certified in this review, by my count, at least six different questionnaire responses and supplemental questionnaire responses. One that is particularly of note is a series of documents from pages 7202 of the record to 7213 to 7214 of the record. That is where, in the underlying review, Apfion actually suggested that there was fraud going on where Kohler was not reporting all of its sales in Germany during this review period. And Kohler, you know, in addition to falsely, on repeated occasions, falsely certifying that it had reported all its sales, in this case said, no, there's not a fraud going on, and certified that. That's at 1713.14 of the record. So this is pretty significant. This case was already in litigation when Commerce discovered the fraud in the third review and had to effectively take the case back in order to cleanse the proceeding from fraud. So each of the courts, and this court, for example, at pages 1379 to 80 of its decision in the third review case, determined that when you have a situation of fraud like this one, Commerce may reasonably determine that it's not a matter of the numerical value of the fraud, but that a respondent's credibility may be impeached. And the fraud may be considered to pervade the responses beyond what Commerce is able to specifically confirm has been falsified. Now, let me ask you one thing. When he was arguing, Mr. Wood said in response to a question from me that the record does not reflect when this calculation error relating to the 144% transaction-specific margin was discovered. Do you agree that there's nothing in the record reflecting that when Kohler learned about that? No. I agree that Kohler has never said when it learned. And one important aspect of that is that this was long after the review closed. And to go back to another question that one of your colleagues asked, Your Honor, this 144% rate was absolutely used in the underlying proceeding. It was one of the sales that Commerce used in creating its calculations for the underlying proceeding. Let me ask you, if I could, one other question. This 144% rate issue comes up in connection with the question of corroboration. That's correct. The 75.36 petition rate that was applied as the total AFA rate, correct? Right, which, as this Court noted in the third review case, is quite a bit lower than that. It's about half the 144% rate that was used for corroboration and much closer to the other high-margin transactions. Now, are we in a little bit, since we're talking about corroboration under that section of the statute, and I can't recite, but you know what I'm thinking of. Yes, Your Honor. Is this a little bit of a different situation here in that, all right, Kohler had acted improperly, they hadn't disclosed these transactions yet. We're now sort of in a different arena. They should have the chance at least to address the corroboration, and that's why they came forward with this purported evidence of a miscalculation. I think I can address that question, Your Honor. First of all, something that this Court ruled in the third review case, as well as its previous decision in Nanyang, was that Commerce is not required to corroborate corroborating data. So that's one issue. But secondly, Commerce here did give Kohler an opportunity to submit information relevant to the AFA and corroboration rate. This is at page 8062 of the record, where Commerce said, look, if you want to submit information, which Kohler did? It submitted information, well, our rates in other reviews were not this high. It could have submitted even more extensive information about who at Kohler had done this, more information trying to show its cooperation, and it did submit a certain amount of that information, all of which Commerce considered, and we have a disagreement over whether that restored their confidence in Kohler. But what Commerce said specifically at 8062, and this goes back to some of this Court's kind of fundamental jurisprudence on these type of fraud issues, cases like Home Products, Esser Steel, and Avisma, Commerce said, look, we are in a closed administrative review that we only have to reopen because you committed fraud and we have to cleanse the fraud from the proceeding. We are not going to let you go back and try to revise your sales data for the review. It said specifically we'll accept information on AFA and corroboration,  I apologize, you're in the middle of a thought there, but time is fleeting in oral argument. I understand, Your Honor. Let me just ask you one additional question, and it relates to the 144%. The Court of International Trade threw that out, said I'm not going to consider that, but then came and said there's enough here. What is your view with respect to the backup position of the Court of International Trade that ended up affirming Commerce's remand determination? Is that enough? What exactly did the Court rely on? Yes, it is enough. I should point out that the Court of International Trade at the time it made that decision, it threw out the 144% as aberrational on space. It did not have the benefit of this Court's decision saying that's not a valid basis to throw it out. Right, but it did, and it did have other data that our court in AR3 did not have because in AR3 the court was so caught that it just didn't fight that particular point. Well, this is the same exact data that the court looked at in AR3. So the other high-margin transactions on the record that the trial court in this case relied on are the same other high-margin transactions that this court remarked on in AR3. Are you saying that AR3 binds us and that we can't agree with the Court of International Trade, that it's an aberrational point for purposes of AR2? Well, it's the same data. So to the extent that this court in AR3 said this is not aberrate, you can't rule it's aberrational on space just because it's higher than other sales, it's factually identical. It's not a collateral estoppel issue because you're dealing with two different administrative reviews, but it's the exact same data. In fact, the data that was used in AR3 were Kohler's reported sales in AR2. So it's even more contemporaneous here. To your Honor's point, it's not just the 144%. Commerce was very explicit, and this is, for example, at page 8968 of the record, also at 8965 of the record, also at 8938 of the record, where Commerce said we looked at the range of Kohler's high-margin transactions in the review. So Commerce looked at that range. I just have a hard time following that math and the backup theory. So if 144 is out, how does the fact that sometimes they go up to 45 get you to 70-something? Well, 50 is surely much closer to 70. The 75% rate, Commerce didn't choose the 144% rate. It chose the 75% rate. It's a heck of a lot closer to 50. Something that Commerce noted, and this is at page, well, it's at page 8967, at 66 of 67 of the record. They made several findings that are relevant here. As Commerce noted, and the trial court, I'm sorry, this court noted in the third review case, you know, not only were there other high-margin transactions, one at 50%, one at 30%, 18 others between 20 and 30%, but this was in a world where Kohler had concealed a portion of its sales. Commerce made specific findings that we don't ultimately know the scope of how many sales that Kohler concealed. Commerce made specific findings that because of the fraud, there may be further misrepresentations that we are not aware of. But in a world where Kohler- On a 25% swing, actually it was more than 25%, but that is, you know, that gets to the point of becoming really punitive as opposed to just allowing for a little bit of a deterrence margin. If you take their somewhat, also somewhat aberrational high point, and then you add another 25% on top of that, that doesn't seem to be what the point of AFA is all about. Well, again, here Commerce recognized, and that's something that this court has recognized as well, there was a limited amount of data because the only respondent in the proceeding had committed fraud. There are several related points here. First, Commerce understood that the sales that would have created the highest margin transactions were the ones that Kohler concealed by definition of the fraud scheme. Second, it did include a built-in increase for deterrence, and Commerce said, and even Kohler kind of admitted, that an AFA rate is supposed to include a built-in increase for deterrence. In addition, you have a situation where Commerce has said, and this Court has recognized, that it's specifically authorized by statute to use a petition rate. I mean, it literally used the rate that the statute says Commerce is allowed to use, and that was its practice. This Court has recognized that practice in the third review case and said that is an okay practice in a situation like this one where the rate has to be corroborated to the extent practical. Last point on this issue. What Commerce did is very much consistent with both the statute and the statement of administrative action because the statute itself says to the extent, it has to corroborate to the extent practicable, and the SAA in turn says if corroboration is not practicable, Commerce, it's still appropriate for Commerce to apply AFA. The only sales data that anyone put on the record of this proceeding is Kohler's second review sales data from this proceeding. Commerce used its statutorily authorized normal AFA practice and said, look, given the data on the record. Do you agree with the CIT that there's a tension between the two obligations or the one which is the right of Commerce to use AFA and the other is Commerce's obligation to corroborate? And do you agree that there's a tension and AFA can override the corroboration obligation? We don't completely agree with the CIT's analysis relying on fraud, but this Court itself, for example, in the third review case, has recognized a balancing between the two subsections, the deterrence requirement and corroboration requirement. To the extent those are in tension, Congress itself has indicated by using the to the extent practicable language and also by indicating in the SAA to the extent that corroboration is not practicable, that will not prevent Commerce from applying AFA. Commerce itself has tipped the balance in favor of AFA. But what the CIT did in this case, very much consistent with what this Court said in the third review case about the same other high margin transactions, was that that was sufficient, even if one were to throw out. What we said in prior cases that AFA can't meet the end of the inquiry, that there still is a corroboration obligation. Right. And here, look, Commerce did compare it to the other. It said, look, we looked at the range of their transactions, and this was good enough. That's assuming we accept the 144. Well, even without the 144, there are still other transactions with a built-in increase for deterrence. The one thing I'll add on that, this is important. Commerce made general findings several places, but the most particular are pages 8951 to 52 of the record, as well as 8956 of the record, that not only had Kohler's fraud undermined the credibility of its submissions prior to, during the actual review, because this review was closed, but it also undermined the credibility of Kohler's post-remand submissions, these self-serving submissions. And that finding certainly extends not just to their claims about the 144% margin. Thank you, Mr. Krillin. As you can see, your light is on. We'll hear from Mr. Schneiderman for two minutes. Thank you, Your Honor. Thank you, Your Honor. If I could start just by dispelling this notion put forward by Krohler that the five missing sales were never in dispute and that Appian had never alleged transshipments during the second review. In fact, we had. I would refer to the court to the record appendix document 7205 to 7206. We actually alleged during the underlying AR2 proceeding, based on their reported sales data, that this exact transshipment scheme had been occurring, and not only that it had been occurring, but that it had been occurring throughout the period of review. And, in fact, as Judge Stansu pointed out in his decision at appendix page 16, we only had circumstantial evidence at the time. We couldn't prove it. They denied it. But we had alleged this exact same scheme. In fact, a third country transshipment scheme to the same customer that they ultimately admitted to later was occurring throughout the second period of review. Weren't there transshipments in the fourth period of review? Yes, there were some. But Congress still found a zero percent. Well, Krohler, you know, by that time, and I think it extended through a portion of the beginning of the fourth review, but they had never withheld that. I mean, by that time they'd already been caught, and so in their initial response they reported all sales. But in this case, again, this is the second review, we had alleged throughout the period they had been concealing these sales. Later on they made the self-serving assertion that, in fact, there was only five sales towards the end. But that was, you know, it's in dispute. We certainly don't accept their representations. That was a very self-serving representation. As Mr. Krohler just pointed out, Congress found it not to be credible. And, again, the same thing with the information that they provided with respect to the sale with the 144. They provided that to Congress. Congress found it not to be credible. They rejected it from the record. So, again, it's not even a valid distinction between the second review. But what evidence did Congress rely on to find it not credible other than, well, you lied to us once, so you're probably still lying to us? Well, I think this Court's decision in ad hoc shrimp and in Krohler's third review say that, you know, look, if you lie to us with respect to one aspect of your response, it's reasonable for us to find the entire response not to be reliable or credible. And that's certainly what Congress found here. And, again, as Mr. Krohler said, that extends not just to their underlying data but to some of the representations that they made in redetermination. Now, again, they did rely on some admissions against interest that Krohler had made, but that doesn't necessarily mean that the self-serving statements that Krohler made necessarily had to be credited, and Congress did not credit those. Thank you, counsel. Mr. Wood has some rebuttal time. Yes, Your Honor. The Appleys tried to continue to pound a square peg into a round hole by trying to fit this case into the AR3 precedent. In this case, there was evidence submitted to Commerce that the 144.63% transaction was the result of a mathematical error. We're not suggesting that the corroborating rate has to be corroborated itself, but when there's evidence that it's a mathematical error, Commerce abuses its discretion if it refuses to even consider that evidence. But the AR3 case did reach the conclusion that the 144 number was relevant and not aberrational, didn't it? Correct. Now, that's a very different question. Why isn't there a collateral estoppel, at least, as to that? Because it's a very different question. There's a very big difference between an allegation that a number is aberrational on its face, which we continue to believe this one was, and Judge Stancy found that it was. There's a big difference between aberration on its face and the result of a mathematical error that can be demonstrated with evidence that we attempted to submit. So those are two very different situations. And so here, if the 144.63% transaction is taken out, we're not aware of any case in which Commerce has used an AFA rate that wasn't corroborated by at least one transaction at or above that AFA rate. Now, here, the highest margin ever calculated for Kohler was 6.5% from the original investigation. You can't possibly say that using 75.36% as an AFA rate is a reasonable estimate of Kohler's actual margin, albeit with some built-in increase as a measure of deterrence. So you're saying that the conclusion in AR3 that it's not aberrational on its face would bind us, but that to the extent that there was data submitted after the remand to show that that, even if not aberrational on its face, was the product of a miscalculation or a mathematical error, that that shouldn't bind us. Is that what you're saying? Well, I wouldn't necessarily agree that the aberrational on its face question would bind you, but it doesn't matter here because here it's entirely different. Our argument here is not that it's aberrational on its face. Our argument is that it's the result of a mathematical error and that Commerce abused his discretion by refusing to consider our evidence. So we'd have to find that underlying point first, that it was an abuse of discretion not to consider it. Yes, that's correct. Or you could let Judge Stancy decide that in the first instance because he expressly left that question open, and I think he hinted at what he thought about it, but he didn't need to address it because he thought it was aberrational on its face. Thank you, counsel. Thank you. We will take the case under advisement, and the court will adjourn briefly. Thank you. Thank you.